1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

AUG 03 1999   MR

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                   DEPUTY

99-CV-01261-CMP

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA *ex rel.*
MARK F. ERICKSON,

                               Plaintiff,

        v.

UNIVERSITY OF WASHINGTON
PHYSICIANS, CHILDREN'S UNIVERSITY
MEDICAL GROUP, and ASSOCIATION OF
UNIVERSITY PHYSICIANS,

                               Defendants.

No. **C99 - 1261**

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT

[FILED UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)]

**COMPLAINT**

        Plaintiff/Relator Mark F. Erickson files this Complaint against defendants and alleges as

follows:

## I.        INTRODUCTION

        1.        This is an action to recover damages and civil penalties on behalf of the United States

of America arising from false statements and claims made and presented by the defendants and/or

their agents, employees, and co-conspirators in violation of the Federal Civil False Claims Act, 31

U.S.C. §§ 3729 *et seq.*, as amended ("the Act"). The violations consist of misrepresentations to the

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                                        - 1 -

1344.10 0001 HSC.DOC

**HAGENS BERMAN**
*Attorneys at Law*

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594

ORIGINAL

1   Medicare, Medicaid, and CHAMPUS programs relating to the nature and complexity of services

2   performed for program beneficiaries.  When defendants' compliance program uncovered fraudulent

3   billing resulting in unwarranted federal payments, defendants failed to disclose and affirmatively

4   concealed billing improprieties from Government agents in order to retain funds to which they were

5   not entitled.

6        2.     The Act provides that any person who knowingly submits or causes to be submitted a

7   false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of

8   between $5,000 and $10,000 for each such claim submitted or paid, plus three times the amount of

9   the damages sustained by the Government.  Liability attaches both when a defendant knowingly

10   seeks payment that is unwarranted from the Government and when false records or statements are

11   knowingly created or caused to be used to conceal, avoid or decrease an obligation to pay or transmit

12   money to the Government.  The Act allows any person having information regarding a false or

13   fraudulent claim against the Government to bring an action for himself (the "relator") and for the

14   Government and to share in any recovery.  The Complaint is filed under seal for 60 days (without

15   service on the defendants during that period) to enable the Government: (a) to conduct its own

16   investigation without the defendants' knowledge, and (b) to determine whether to join the action.

17        3.     Based on those provisions, plaintiff/relator seeks to recover damages and civil

18   penalties arising from the defendants' presentation of false records, claims, and statements to the

19   United States Government and its agents in connection with defendants' claims for payment for

20   services provided patients under the federal programs.  Defendants' actions were designed to

21   maximize profits illegally at the government's expense and not for a medically justifiable purpose.

22   The defendants' fraud included the following:

23        a.     defendants routinely billed for medical services at a more complex level of

24   procedure than was warranted by the services provided;

25

26

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT       - 2 -

HAGENS BERMAN
Attorneys at Law

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594

 

1          b.      defendants fraudulently claimed reimbursement for medical services provided

2  by attending physicians when those services actually were provided by residents alone or with

3  minimal supervision;

4          c.      defendants backdated and falsified medical records to fraudulently document

5  or bill for services that were not eligible for federal payment;

6          d.      defendants concealed, altered and/or destroyed internal audit reports that

7  defendants discovered, learned, and knew contained information that they should have utilized to

8  reimburse the federal programs for excessive payments previously made.

9                       **II.    PARTIES**

10     4.      Plaintiff and relator, Mark F. Erickson, is a resident of Seattle, Washington and an

11  employee of defendant Children's University Medical Group ("CUMG"). Erickson was originally

12  employed by defendant University of Washington Physicians Group ("UWP") in May 1991 as a

13  Professional Fee Coordinator ("ProFee"). The job of the ProFee is to assist the physician in the

14  completion of charge documents and required medical record documentation and enter the fee

15  information into the billing system. In May 1998, he transferred to CUMG as ProFee for the

16  surgical department. In March 1999, Erickson was promoted to the position of internal auditor for

17  CUMG.

18     5.      Erickson brings this action for violations of 31 U.S.C. §§ 3729 *et seq.*, on behalf of

19  himself and the United States Government pursuant to 31 U.S.C. § 3730(b)(1). Erickson has

20  personal knowledge of the false records, statements and/or claims presented to the Government by

21  and for the defendants named herein and of defendants' fraudulent coding, billing, documenting, and

22  auditing practices.

23     6.      Defendant University of Washington Physicians is a Washington corporation and

24  medical group practice. It was established in 1962 under the name Associated University Physicians

25  and incorporated as a not-for-profit organization in 1984. In 1989, the business name was amended

26

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT       - 3 -

1344.10 0001 BSC.DOC

HAGENS BERMAN
*Attorneys at Law*

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594

1   to University of Washington Physicians. The 600 physicians are faculty members of the University

2   of Washington School of Medicine ("School") and, as such, serve as teaching physicians for

3   physicians-in-training or residents. Additionally, they provide primary care at the University of

4   Washington Medical Center, Harborview Medical Center, Children's Hospital and Medical Center,

5   Fred Hutchinson Cancer Research Center, and a network of primary care neighborhood clinics. As

6   an organized practice plan, UWP codes, bills, and collects professional fees in a centralized manner

7   for services rendered to patients.

8       7.       UWP is organized into departments that correspond to the clinical departments of the

9   School of Medicine. It is governed by a Board of Trustees comprised of the School's 18 clinical

10   department chairs, called departmental trustees, and six elected members. The Board is chaired by

11   the President who is appointed by the Dean of the School of Medicine.

12      8.       The Management Committee of UWP, responsible for the oversight of practice

13   management, is comprised of seven members, including four departmental trustees and is chaired by

14   the President. The Executive Director, responsible for implementing and managing the UWP billing

15   compliance plan, functions under the auspices of the Management Committee and presents periodic

16   reports to the Management Committee, the Board of Trustees, and the Dean relating to any

17   recommended revisions to the billing compliance plan. UWP's Executive Director is Brian

18   McKenna.

19      9.       Defendant Children's University Medical Group[1] is the group practice for UWP from

20   the University of Washington's School of Medicine's Department of Pediatrics. It is comprised of

21   approximately 148 physicians in 27 specialty departments, including Dermatology, Infectious

22   Diseases, Neurodevelopmental/Birth Defects, Craniofacial, Orthopedics, Pulmonary,

23   Immunology/Rheumatology, Emergency, General Pediatrics, Endocrinology, Adolescent Medicine,

24   Rehabilitation, Neurology, General Surgery, Gastroenterology, Cardiology, Ophthalmology,

25   Nephrology, Otolaryngology, Hematology/Oncology, Urology, Plastic Surgery, Neurosurgery,

26   _____
   [1] References to UWP are intended to include CUMG unless CUMG is specifically named.
   COMPLAINT FOR VIOLATIONS OF THE          - 4 -
   FALSE CLAIMS ACT

1344.10 6001 BSC.DOC



HAGENS BERMAN
Attorneys at Law

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594



1  Genetics, Allergy, Psychiatry, and Cardiovascular Surgery.  As a part of UWP, CUMG is subject to

2  the same management structure.

3      10.     Defendant Association of University Physicians was incorporated as a not-for-profit

4  organization in January 1984.  The business name was amended to University of Washington

5  Physicians in September 1989.  Defendant Association of University Physicians remains an active

6  Washington non-profit corporation located at 2324 Eastlake Ave E., Suite 500, P.O. Box 50095,

7  Seattle, WA 98145.

8               **III.     JURISDICTION AND VENUE**

9      11.     The Court has jurisdiction over the subject matter of this action pursuant to both 28

10  U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this

11  Court for actions brought pursuant to 31 U.S.C. § 3730.

12     12.     The Court has personal jurisdiction over the defendants pursuant to 31 U.S.C.

13  § 3732(a) which authorizes nationwide service of process and because the defendants can be found

14  in and transact the business that is the subject matter of this lawsuit in the Western District of

15  Washington.

16     13.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because defendants

17  can be found and transact the business that is the subject matter of this lawsuit in the Western

18  District of Washington.

19               **IV.     BACKGROUND**

20     14.     The fraud at issue in this action involves the defendants defrauding the Medicare,

21  Medicaid, and CHAMPUS programs by:  (1) submitting false claims for payment for medical

22  services that they knew or should have known were not provided as billed, and (2) failing to disclose

23  false billings uncovered by internal audits and retaining payments to which they were not entitled.

24

25

26

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                              - 5 -



HAGENS BERMAN
Attorneys at Law

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594

A.    **Federal Health Programs:**

1.    **Medicare**

15.    Medicare is a federally-funded health insurance program primarily benefitting the elderly. Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted and has two parts. Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care. Medicare Part B ("Part B"), the Voluntary Supplemental Insurance Plan, covers the cost of physician's services, including services provided to patients who are hospitalized, if the services are medically necessary and directly and personally provided by the physician.

16.    Federal programs pay only for those services that are reasonable and necessary for the diagnosis or treatment of illness or injury. 42 USC § 1395y(a)(1)(A). Providers and physicians who wish to participate in the these programs must ensure that their services are provided "economically and only when, and to the extent, medically necessary." 42 USC § 1320c-5(a). The physician submits a bill using Form HCFA-1500. On the claim form, the physician certifies that the services were "medically indicated and necessary to the health of the patient . . . ."

17.    Medicare is generally administered by private insurers under contract to the federal government. Under Part A, these contractors, known as "fiscal intermediaries," administer the program in accordance with rules developed by the Health Care Financing Administration ("HCFA"). Under Part B, the government contracts with insurance companies and other organizations known as "carriers" to administer payment for physicians' services in specific geographic areas.

18.    The Medicare program requires that Part B claims be submitted using the American Medical Association's Current Procedural Terminology ("CPT") Codes. CPT Codes are intended to simplify and standardize billing and to identify accurately the service provided. Sequential CPT Codes are assigned similar services with differing levels of complexity. For example, one of three

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                           - 6 -

HAGENS BERMAN
*Attorneys at Law*

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594



1  codes applies to a hospital admission (99221, 99222, or 99223), ranging from a straightforward

2  admission requiring medical decision-making of low complexity (99221) to a difficult admission

3  requiring medical decision-making of high complexity (99223). Higher complexity services,

4  associated with higher last digits in the code, typically command a higher payment from Medicare as

5  well as other federal health insurance programs.

6       19.    Hospitals are reimbursed under Part A on a reasonable cost basis for services

7  provided to Medicare patients. Resident salaries are included among the costs for which hospitals

8  are reimbursed under Part A. Thus, services provided by residents cannot ordinarily be billed under

9  Part B.

10      20.    Teaching hospitals, such as the University of Washington Medical Center, are

11  reimbursed for the teaching activities of clinical faculty physicians under Part A. Those payments

12  are designed to supplant the fee-for-service charges that might otherwise be submitted by the clinical

13  faculty under Part B. The reimbursement rate under Part A for time spent supervising residents who

14  treat Medicare patients is considerably lower than the reimbursement rate under Part B for time spent

15  providing clinical services to Medicare patients. Thus, clinical faculty physicians are prohibited

16  from billing Medicare Part B for services provided by residents supervised as part of the teaching

17  responsibilities of the clinical faculty physicians.

18      21.    Teaching physicians may bill Part B for all medical services they directly and

19  personally provide to a Medicare patient. Under very limited circumstances, clinical faculty also

20  may seek reimbursement under Part B for work actually performed by a resident. Prior to July 1,

21  1996, in order to qualify for reimbursement under Part B, a teaching physician had to first meet the

22  Medicare criteria for an "attending" physician, and second, be present and directly supervising the

23  resident's work. After July 1, 1996, teaching physicians were no longer required to be "attending

24  physicians" within the meaning of the regulations, but they are still required to be present "during

25

26

1344.10 0001 BSC.DOC

HAGENS BERMAN
*Attorneys at Law*

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594



1   the key portion of any service or procedure for which payment is sought." 42 CFR 405.521;

2   415.172.

3       22.     Under applicable Medicare rules prior to July 1, 1996, clinical faculty physicians

4   could qualify as an attending physician only if they performed each of the following functions:

5           a.      review the patient's history, the record of examination and tests performed in

6   the hospital, and review frequently the course of treatment to be followed;

7           b.      be physically present during the portion of the service that determines the

8   level of service billed and document said presence and participation;

9           c.      confirm the resident's documentation and summary comments or revise the

10  resident's findings relating to history, examination, and medical decision-making;

11          d.      either perform the physician services required by the patient or supervise the

12  treatment to insure that the appropriate services are provided by residents, or others, and that

13  an acceptable quality of case is maintained;

14          e.      be present during the patient's entire physical examination or document

15  his/her independent findings;

16          f.      be present and ready to perform any service which is performed by an

17  attending in a non-teaching setting when a major surgical or complex medical procedure is

18  performed;

19          g.      be recognized by the patient as the attending physician and be responsible

20  personally for the continuity of care throughout the period of hospitalization for which claims

    are submitted.

21      23.     A physician is _not_ permitted to bill Medicare as an assistant at surgery in a hospital

22  with a teaching program provided that (1) the "hospital has a training program relating to the medical

23  specialty required for such surgical procedure" and (2) "a qualified individual on the staff of the

24  hospital is available to provide such services." 42 U.S.C. § 1395u(b)(7)(D)(i). The only exceptions

25  to such a prohibition are if the assistant's services (1) "are required due to exceptional medical

26

COMPLAINT FOR VIOLATIONS OF THE          - 8 -
FALSE CLAIMS ACT

1344.10 0001 BSC.DOC



HAGENS BERMAN
Attorneys at Law

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594

1  circumstances," (2) "are performed by team of physicians needed to perform complex medical

2  procedures," or (3) "constitute concurrent medical care relating to a medical condition which

3  requires the presence of, and active care by, a physician of another speciality." *Id.* Under applicable

4  federal rules and regulations, the term "individual on the staff" is considered to refer to qualified

5  residents for purposes of 42 U.S.C. § 1395u(b).

6      24.    An assistant at surgery is defined as "a physician [or physicians's assistant] who

7  actively assists the physician in charge of a case in performing a surgical procedure." *Id.* at

8  (b)(7)(D)(ii).

9      25.    Medicare Part B reimburses assistants at surgery procedures, when a qualified

10  resident is not available, that are identified on the HCFA Form 1500 by adding the modifier '82' to

11  the usual CPT codes. For example, if a surgeon is performing a replacement valve/cardiopulmonary

12  bypass the claim form would contain the CPT code 33405 with the '82' modifier, if an assistant at

13  surgery was present.

14      **2.    Medicaid**

15      26.    Medicaid was created in 1965 when Title XIX was added to the Social Security Act.

16  Medicaid is a public assistance program to provide payment of medical expenses for low-income

17  patients. Funding for Medicaid is shared between the federal government and those state

18  governments that choose to participate in the program. In Washington, the Medicaid program is

19  funded with 50% federal funds and 50% state funds. At all times relevant to this complaint,

20  applicable Medicaid regulations were substantially similar in all material respects to those alleged

21  above.

22      **3.    CHAMPUS/TRICARE**

23      27.    The Civilian Health and Medical Program of the Uniformed Services

24  ("CHAMPUS")[2] is a program of medical insurance benefits provided by the federal government to

25

26  _____
     [2] In 1998, CHAMPUS was renamed TRICARE. Nevertheless, the term CHAMPUS is used in this complaint
     because UWP documents refer to the program that way.

COMPLAINT FOR VIOLATIONS OF THE          - 9 -
FALSE CLAIMS ACT

HAGENS BERMAN
*Attorneys at Law*
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594

1    individuals with family affiliations to the military services. At all times relevant to this complaint,

2    applicable CHAMPUS regulations were substantially similar in all material respects to those alleged

3    above. 32 CFR § 199.4(c)(xiii).

4        **4.    Duty To Disclose**

5        28.    Providers or physicians who discover material errors in claims submitted for

6    reimbursement to Medicare, Medicaid, and CHAMPUS are required to disclose those matters to the

7    Government or its fiscal intermediaries. They are not free silently to accept windfalls from such

8    errors, much less to take steps to conceal them. 42 U.S.C. § 1320a-7b(a)(3) creates a duty to

9    disclose known billing errors by making a failure to disclose a felony. The statute provides:

> Whoever . . . having knowledge of the occurrence of any event
> affecting (A) his initial or continued right to any such benefit or
> payment . . . conceals or fails to disclose such event with an intent
> fraudulently to secure such benefit or payment either in a greater
> amount or quantity than is due or when no such benefit or payment is
> authorized, . . . shall in the case of such a concealment or failure . . . be
> guilty of a felony.

The duty to disclose known errors or billing improprieties extends to all federal health insurance

programs at issue in this complaint. 42 U.S.C. §1320a-7b(a)(1).

**V.    ALLEGATIONS**

**A.    Fraudulent Billing**

17        29.    Physicians billing for services submit a "HCFA-1500," Health Insurance Claim Form.

Those forms use Current Procedural Terminology (CPT) codes for identifying medical services and

procedures performed by physicians. The CPT codes provide a uniform language that describes

various medical and diagnostic services provided to patients. Each procedure or service is identified

with a five digit code and Medicare, Medicaid and CHAMPUS compensate physicians based on the

CPT code submitted by the provider.

        30.    Evaluation and management ("E/M") services are divided into broad categories such

as office visits, hospital visits, and consultations. Most of these are additionally subdivided into new

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                                  - 10 -

1344.10 0001 BSC.DOC

HAGENS BERMAN
*Attorneys at Law*

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594

 

1    and established office patients or initial and subsequent hospital visits. The subcategories are further

2    designated by levels of service, with level 1 denoting the least medically intensive service and level

3    5 the most intensive. These levels of service are identified with specific CPT codes. For example,

4    99212 is the CPT code for a level 2 office visit by an established patient whose presenting

5    problem(s) are minor and with whom the physician typically spent 10 minutes face-to-face.

6           **1.    Systematic Upcoding**

7           31.    Since at least 1994, CUMG has provided its physicians with preprinted billing cards

8    for inpatient examinations, consults, and follow-up visits. The cards provide blanks for the

9    physician to fill in including, *inter alia*, dates of service, level of service, diagnosis, CPT code, and

10   signature. Some departments use cards that limit a physician's choices to high complexity codes

11   only. For example, the billing card for the Nephrology Department permits the physician to choose

12   between two possible levels of service for the initial consult - level 4 or level 5. Service levels 4 and

13   5 specify that the patient's presenting problems are of moderate to high severity and that the

14   physician spent between 45 to 60 minutes face-to-face with the patient. Additionally, the physician

15   must have completed a comprehensive history and examination and made medical decisions of

16   moderate to high complexity. That complexity of medical decision-making signifies that the

17   physician had to make multiple or extensive diagnoses, reviewed data of moderate to extensive

18   complexity, and the risk of complications and/or mortality was moderate to high. The

19   documentation in the patient's record must reflect that the services performed corresponded to the

20   level of service indicated on the billing card.

21          32.    The Nephrology Department billing card also assumes that all follow-up visits are

22   level 2 or 3 (intermediate level) unless the physician specifically notes that the proper level is either

23   less or more. The card, however, provides no space for the notation.

24          33.    UWP does not utilize a pre-printed card system. Instead, the ProFee is responsible for

25   reviewing inpatient charts and determining, based on the documentation, the correct CPT code for

26

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                 - 11 -

1544.10 0001 BSC.DOC


HAGENS BERMAN
*Attorneys at Law*

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594



1  the services provided.  CUMG ProFee's are instructed to rely on billing cards to code for inpatient
2  services.

3       34.    UWP and CUMG both provide physicians with preprinted fee sheets for medical
4  services provided to outpatients.  The sheets provide boxes for the physician to fill in including, *inter*
5  *alia*, CPT code, signature of attending physician, and signature of clinician.  The sheet for CUMG
6  Psychiatry and Behavioral Medicine, for example, limits the CPT codes that can be chosen by the
7  physician.  The CPT codes 99201 (level 1) and 99202 (level 2) for new patients are not options on
8  the sheet.  Likewise, the corresponding codes 99211 and 99212 for established patients and 99241
9  and 99242 for consults are not options.  The only codes available on the sheet are levels 3, 4, and 5,
10 regardless of the level of service actually provided by the physician.  The documentation in the
11 patient's record must reflect that the services performed corresponded to the level of service
12 indicated on the fee sheet.

13      35.    All outpatient fee sheets are billed "blindly."  Fee sheets are sent directly to data entry
14 personnel who bill federal programs based on the information they contain without any review of
15 medical records or patient charts.  There are no ProFees assigned to outpatient clinics in the UWP
16 system.

17      36.    Defendants have systematically upcoded medical services provided to both inpatient
18 and outpatient beneficiaries of Medicare/Medicaid/CHAMPUS, thereby defrauding the federal
19 government.  As reimbursement is predicated on the CPT code submitted, there is a significant
20 financial incentive for providers to upcode or code the service at a higher level than is warranted by
21 the services rendered to the patient.  Defendants' actions were designed solely to maximize profits
22 illegally at the government's expense and not for any medically justifiable purpose.

23      37.    One of the most flagrant examples of systematic upcoding involves dialysis patients.
24 Single hemodialysis and peritoneal dialysis procedures are coded using CPT codes 90935 and
25 90945, respectively.  The respective codes for multiple evaluations are 90937 and 90947.

26

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                         - 12 -

HAGENS BERMAN
Attorneys at Law
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594

38.     Since about June 1995 and continuing to the present, defendant CUMG has billed CPT codes 90937 and 90947 exclusively, regardless of the duration of the service provided. Patient medical records do not support billing for multiple evaluations in most instances and those multiple evaluations were not actually performed.

**2.     Services Performed by Residents**

39.     Medicare reimburses under Part A for services provided to Medicare patients by residents. Accordingly, resident services cannot be billed under Part B.

40.     Medicare Part A also provides a teaching supplement to defendants to compensate clinical faculty physicians for time spent training residents. Accordingly, teaching functions cannot be billed under Part B.

41.     The teaching physician must personally document presence and participation in all services billed. The documentation should refer to the resident's note if the resident gathered the history and performed the physical examination.

42.     Despite the express requirements imposed by Medicare with respect to clinical faculty billing under Part B, clinical faculty physicians employed by the defendants routinely sought and continue to bill Part B for services performed by residents that do not satisfy those conditions. Specifically, residents routinely perform all of the services (including a history and physical examination) required to admit patients outside the presence of any teaching physician. Similarly, subsequent inpatient care is also performed regularly by residents without the teaching physician. Documentation provided in patient medical records is typically insufficient to support billing for services rendered by teaching physicians.

43.     At all times relevant to this complaint, defendants were aware that government programs did not reimburse for services provided by residents except under circumstances expressly identified in the applicable regulations. Specifically, defendants were aware that faculty physicians only could be reimbursed for services performed by residents if the faculty physician was present,

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                         - 13 -

HAGENS BERMAN
Attorneys at Law

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594

1344.10 0001 BSC.DOC

 

1  directly performing or supervising the procedure and, prior to July 1996, only if the faculty physician

2  qualified under the regulations as an "attending physician."

3      **3.    Backdating and False Documentation**

4      44.    Defendants undertook a systematic effort to revise their medical records long after

5  they were initially entered on patients' charts. The purpose of backdating and fabricating support for

6  services not actually performed was two fold: 1) to support new billings that would generate

7  additional revenue; and 2) to fabricate support for claims that had previously been improperly billed

8  and paid.

9      **a.    Supporting New False Billings**

10          <u>Assistants at Surgery Services</u>

11      45.    Assistants at surgery must comply with federal regulations. Federal law explicitly

12  requires that for an assistant at surgery to bill Medicare, a qualified resident must not be available

13  unless there are exceptional medical circumstances, the attending physician has a policy of never

14  involving residents or it is a complex medical procedure requiring a team of physicians of different

15  specialities. Compliance with assistants at surgery requirements is a prerequisite for payment by

16  Medicare and other federal programs.

17      46.    From at least 1997, and continuing to the present, defendant UWP began a systematic

18  pattern and practice of creating backdated and false documentation to make it appear as if a qualified

19  resident was not available and an attending physician was needed to assist in the surgery. Charts

20  were altered to include a sentence stating that "due to the complexity of this operation and because

21  no qualified resident was available, Dr. ____ assisted Dr. ____."[3] The exceptional nature of the

22  service, however, must be reflected elsewhere in the billing process or operative notes of the other

23  surgical staff.

24

25      [3] Complex medical procedures, such as multistage transplant surgery and coronary bypass, may require a team of surgeons. In these situations, each of the surgeons performs a unique, discrete function requiring special skills integral to the total procedure. Each physician is engaged in a level of activity different from assisting the surgeon in charge of the case.

26

COMPLAINT FOR VIOLATIONS OF THE        - 14 -
FALSE CLAIMS ACT

1344.10 0001 BSC.DOC

**HAGENS BERMAN**
*Attorneys at Law*

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594



47.     Defendant then submitted false and fraudulent claims for payment for services of assistants at surgery provided to Medicare, and other federal program, patients based on the false documentation.

48.     As a result of these fraudulent activities, the Medicare and other federal programs paid defendant monies for services which were not medically necessary and were expressly prohibited by law.

<u>Dialysis</u>

49.     Medicare regulations require that, if a claim is submitted, there must be documentation in the patient's record that the physician evaluated the patient.  The customary place for such documentation is on the dialysis record which should show that the physician was both physically present during the dialysis and that such presence was medically necessary.  Simply co-signing the record is not sufficient documentation to warrant billing.

50.     Defendant UWP, in an effort to increase its revenues, returned defective charts to physicians for back-dated documentation of personal involvement with the patient often many months after the actual procedure was performed.  Physicians were chosen to falsify documentation based on whether they were the last physician to have provided dialysis care to that particular patient.  If the reviewer could not determine who the correct physician was, the charts were given to either Dr. Connie Davis or Dr. Johnson as they were the most expeditious at completing the documentation.  Defendant then submitted false and fraudulent claims for payment for dialysis services based on the false documentation.

**b.     Supporting Improperly Paid Bills**

<u>"54" Modifier</u>

51.     Modifier "54" is used for coding and billing purposes when one physician performs the surgical procedure and another physician provides the preoperative and/or postoperative care.  If the modifier is not added to the CPT procedural code, the assumption is that a single physician

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                    - 15 -

1344.10 0001 BSC.DOC


HAGENS BERMAN
Attorneys at Law
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594



1  provided all the care and has been reimbursed, in totality.  The surgical procedure code encompasses

2  both pre and postoperative care, thereby, eliminating the need for additional billing.

3        52.     Defendants billed for surgeries without including the "54" modifier in spite of the

4  lack of documentation showing that the surgeon had provided the postoperative care.  As such care is

5  generally provided by the residents, false documentation was later created to support the billings.

6  **B.    Evisceration of Compliance Program**

7       **1.    Program Established**

8        53.     In 1996, UWP developed and instituted a billing compliance plan ("Plan").  The Plan

9  was initially conceived and implemented as a retrospective review process whereby a sample of

10  medical records and charges from each department would be periodically audited for compliance

11  with UWP billing policies and legal requirements.  In the event that the reviewers identified

12  instances of non-compliance, either the medical record was to be corrected, the claims were not to be

13  billed, or a refund was to be paid.  Ostensibly, repeated instances of non-compliance were grounds

14  for suspension or revocation of privileges.

15        54.     Each department chairman was named the compliance officer for that department.

16  All department compliance officers report to the Executive Director, Brian McKenna, who

17  supervises the entire compliance program.  The apparent purpose of the Plan was to ensure that the

18  physicians were properly trained in billing policies and procedures and that compliance deficiencies

19  were expeditiously remedied.

20       **2.    Initial Results of Retrospective Audits**

21        55.     When the Plan was first implemented, the initial retrospective audit results revealed

22  pervasive and egregious upcoding.  In 1998, Ngampid J. Georgakakos, a CUMG internal auditor,

23  reviewed outpatient medical records for compliance with guidelines for documentation of E/M

24

25

26

1344.10 0001 BSC.DOC



HAGENS BERMAN
Attorneys at Law

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594

1   services.  She found that in nine of the 10 departments audited, the key components for E/M

2   services, as documented in the medical records, did not support the level of service billed.[4]

3          **3.      One Level Upcoding Deemed Compliant**

4          56.     The results of these audits coupled with the inpatient/outpatient audit results of the

5   UWP auditor, Sandy Alatorre, sufficiently alarmed UWP that it decided to make several significant

6   changes to the audit system in an attempt to camouflage the extent of the fraud being perpetrated on

7   a practice-wide basis.  The first step was to redefine the term compliance to mean that upcoding by

8   one level would be considered a perfectly acceptable billing practice.  In fact, the format of the audit

9   report was changed and included a statement that "[p]er CUMG policy, CPT codes which differ by

10   one level will be considered compliant.  CPT codes which differ by two or more levels will be

11   considered non-compliant."

12          **4.      Audits Changed from Retrospective to Prospective**

13          57.     The second step was to change the audit system from a retrospective review to a

14   prospective one.  In so doing, defendants sought to avoid their duty to disclose to the government

15   program benefits they received to which they then knew they were not entitled.  Effectively,

16   defendants' decision was to conceal past fraud by neither disclosing it nor making any reasonable

17   attempt to determine further its extent or breadth.

18          58.     The prospective review was initially comprised of the following steps by the auditor:

19          a.      obtain outpatient fee sheets[5] for each physician within the targeted clinics that

20   have not yet been billed;

21          b.      compare the CPT code selected by the physician with the documented notes in

22

23

24      [4] The non-compliance rates due to upcoding only were as follows: Infectious Diseases 35 percent, Urology 86
    percent, Plastic Surgery 33 percent, Cardiology 57 percent, Nephrology 25 percent, Gastroenterology 59 percent,
25   Hematology/Oncology 43 percent, Pediatrics Pulmonary 12 percent, Ophthalmology 0 percent, and Genetics and
    Congenital Defects Craniofacial 13 percent.

26      [5] Fee sheets are also called encounter forms.  UWP audits five sheets per physician while CUMG reviews 10.

COMPLAINT FOR VIOLATIONS OF THE                    - 17 -
FALSE CLAIMS ACT

HAGENS BERMAN
Attorneys at Law

1344.10 0001 BSC.DOC

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594

 

the medical record and verify that the documentation supports the level of service and procedures coded;

  c. document the audit results for each fee sheet. Once the audit is complete, the charges are billed with the requisite corrections;

  d. review the findings with the physicians;

  e. conduct follow-up training and/or follow-up audit, as appropriate, to ensure that coding problems are corrected; and

  f. prepare a memo to the UWP/CUMG Compliance Officer, Brian McKenna, explaining the results of the audit and the corrective measures to be taken, if any.

 59. Using the new prospective system that further institutionalized upcoding, auditors prepared a workplan that included a review of all 27 specialty departments that was to begin in March, 1999 and be completed by September, 1999. As the program got underway, however, the audit results for the first eight CUMG departments so disconcerted UWP management that it halted the process in order to further dilute the system. The findings of the first eight departmental audits are contained in documents labeled "Outpatient Documentation Audit" and produced the following error rates:

  a. Dermatology - 90 percent (2 samples upcoded by one level were not included);

  b. Orthopedics - 7 percent (13 samples upcoded by one level were not included);

  c. Pulmonary - 21 percent (3 samples upcoded by one level were not included);

  d. Infectious Disease - 57 percent (11 samples upcoded by one level were not included);

  e. Rheumatology/Immunology - 18 percent (3 samples upcoded by one level were not included);

  f. Neurodevelopmental/Birth Defects - 12 percent (23 samples upcoded by one level were not included);

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT   - 18 -



HAGENS BERMAN
Attorneys at Law
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594

 

g.      Craniofacial - 22 percent (10 samples upcoded by one level were not

included); and

h.      Emergency Room - 0 percent (8 samples upcoded by one level were not

included).

60.      Initially each prospective audit detailed the number and percentage of compliant

samples as well as the reasons a sample was found non-compliant. Each report had a spreadsheet

stamped "CONFIDENTIAL" detailing the auditor's conclusions on a claim-by-claim basis. The

majority of the problems still resulted from upcoding - by two or more levels. Other errors identified

related to insufficient documentation (*i.e.*, for faculty physicians) and use of wrong CPT code.

### 5.      Calculation of Error Rates Abandoned

61.      Once again, rather than disclosing or remedying widespread billing improprieties,

defendants modified the form and content of the reports. The words "compliant" and "non-

compliant" were eliminated. The entire audit process was refocused solely on whether supporting

documentation was sufficient or "deficient." Documentation was evaluated using the following

criteria:

a.      the date of service and the date on the fee sheet matched;

b.      sufficient documentation by the attending physician;

c.      attending physician signature;

d.      the key components for E/M services supported the level of service billed; and

e.      time was documented when time specific CPT codes were billed.

62.      The auditors were instructed by management to remove any reference to upcoding,

non-compliance, rates, numbers or percentages and to make generalizations when summarizing

findings. The word "audit" was deleted and the term "review" was to be used on all reports.

Internally, emphasis was placed on the distorted notion that the real problem was the failure by the

physicians to accurately document their work and, thus, justify the CPT codes and levels of service

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                                    - 19 -



HAGENS BERMAN
*Attorneys at Law*

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594

 

1  billed. The reports, now entitled "Outpatient Fee Sheet Prospective Review," showed that services

2  previously identified as upcoded were now described as "deficient" due to "insufficient

3  documentation."

4       63.    On the basis of the foregoing protocols, auditors were instructed to produce new

5  sanitized reports in a format purposely designed to obscure the scope of the fraud that was previously

6  uncovered. The sanitized reports described their findings as follows:

7       a.    Dermatology was deemed to have 18 deficient samples out of 20 reviewed.

8  The deficiencies were now termed as insufficient documentation to justify the level of CPT selected.

9  The term "upcode" was not mentioned in the report even though the only two records recorded as

10  non-deficient were, in actuality, upcoded and an additional five records were incorrectly identified as

11  linkage deficiencies - not upcoding.

12       b.    Orthopedics was found to have five non-billable records based upon the level

13  of documentation. No explanation was provided for what led the auditor to that conclusion. The

14  reviewer was permitted only to suggest that the departments or physicians review certain issues, such

15  as billing requirements. The backup document prepared by the auditor revealed that an additional 13

16  records should have been considered deficient due to upcoding.

17       c.    Pulmonary had 10 deficient records out of 33 reviewed. The deficiencies were

18  due to documentation/linkage issues related to teaching physicians. The backup document prepared

19  by the auditor revealed that three more of the records should have ben considered deficient due to

20  upcoding.

21       d.    Infectious Diseases had 30 records reviewed, 20 of which were deficient due

22  to insufficient documentation/linkage. The backup document prepared by the auditor revealed that,

23  in actuality, 12 of the 20 records were deficient due to upcoding.

24

25

26

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT    - 20 -

1344.10 0001 BSC.DOC



HAGENS BERMAN
Attorneys at Law

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594

 

e.     Rheumatology/Immunology had 33 sample records reviewed, nine of which were found to have inadequate documentation. The documentation problem, as reflected in the back-up report, was entirely due to upcoding.

f.     Neurodevelopmental/Birth Defects had 52 records reviewed with only six records considered deficient because of failure to follow teaching physician rules. The back-up report, however, reveals that three of the six were actually upcoded by two or more levels and an additional 23 were upcoded by one level.

g.     Craniofacial had 27 records reviewed with no mention of deficiencies. The back-up report, however, reveals that four of the records were actually upcoded by two or more levels and an additional 10 were upcoded by one level.

**6.     Destruction of Old Results**

64.     Refusing to acknowledge openly that the billing system produced flagrant and widespread false claims, defendants sought to eliminate any evidence of billing improprieties the compliance program had uncovered. For that reason, UWP management ordered that all audit retrospective audit results as well as any prospective audit results with quantified error rates be destroyed and replaced with sanitized versions.

65.     In a May 4, 1999 memorandum to Brian McKenna, the CUMG outpatient audit summary is originally written to provide the Administrator with compliance rates and upcoding found in the initial four departments audited. The report was then sanitized and all references to non-compliance and all quantified error percentages were removed. The summary was written to reflect the new compliance approach, that the issue to be addressed is better educating the physicians in documentation techniques. No effort was made to determine the extent of the upcoding in the other departments so that the fee sheets could be adjusted to reflect the proper CPT code and level of service. Instead, defendants chose to ignore the empirical evidence found by the auditors - that upcoding is rampant throughout both UWP and CUMG.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                                                    - 21 -

1344.10 0001 BSC.DOC

HAGENS BERMAN
Attorneys at Law

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594




66. Defendants, aware of the probability that the upcoding and other violations uncovered by the internal auditors would be found in the remainder of the departments, made a conscious and deliberate decision to ignore the facts before them and not to disclose the information to either the Government or the Medicare carrier. Defendants' silence permitted them to retain monies otherwise reimbursable to the Government.

67. Defendants have systematically ignored their obligation to amend their claims paid or to be paid upon completion of an audit. Because audits can result in reimbursement for claims previously paid, defendants knew their purposeful failure to disclose the audit results resulted in a substantial windfall to them. Instead, defendants sanitized the auditing process in an effort to conceal the past and ongoing fraud, thereby eviscerating the audit process itself.

68. Medicare, Medicaid and CHAMPUS programs suffered direct and substantial damage from defendants' fraud by defendants' false and fraudulent claims for payment for services that were not rendered as billed and their failure to reimburse those programs for unallowable claims previously submitted and paid.

### COUNT ONE

[31 U.S.C. §§ 3729(a)(1), (a)(2), (a)(7) and 3732(b)]

69. Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 68 of this Complaint.

70. This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

71. Through the acts described above, defendants and their agents and employees knowingly presented and caused to be presented to the United States Government, Washington Medicaid program, and CHAMPUS fraudulent claims, records, and statements in order to obtain payment for health care services provided to beneficiaries of those programs.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT

- 22 -

1344.10 0001 BSC.DOC



HAGENS BERMAN
Attorneys at Law

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594

1    72.    Through the acts described above and otherwise, defendants and their agents and

2    employees knowingly made, used, and/or caused to be made or used false records and statements in

3    order to get such false and fraudulent claims paid and approved by the United States Government.

4    73.    Through the acts described above, defendants and their agents and employees

5    knowingly made, used, and caused to be made or used false records and statements to conceal, avoid,

6    and/or decrease defendants' obligation to repay money to the United States Government that

7    defendants improperly and/or fraudulently received.  Defendants also failed to disclose to the

8    Government material facts that would have resulted in substantial repayments by them to the federal

9    and state governments.

10    74.    The United States, its agents, the Washington Medicaid program, and CHAMPUS

11    program unaware of the falsity of the records, statements, and claims made or submitted by

12    defendants and their agents and employees paid and continue to pay defendants for claims that

13    would not be paid if the truth were known.

14    75.    Plaintiff United States, its agents, the Washington Medicaid program, and

15    CHAMPUS program unaware of defendants' failure to disclose material facts which would have

16    reduced government obligations, have not recovered Medicare, Medicaid and CHAMPUS funds that

17    would have been recovered otherwise.

18    76.    By reason of the defendants' false records, statements, claims, and omissions the

19    United States, the state Medicaid, and CHAMPUS programs have been damaged in the amount of

20    millions of dollars in federal funds.

21                                  **COUNT TWO**

22                          **False Claims Act Conspiracy**

23                          31 U.S.C. § 3729(a)(3) and 3732(b)

24    77.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1

25    through 68 of this Complaint.

26

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                    - 23 -

1344.10 0001 BSC.DOC

HAGENS BERMAN
Attorneys at Law

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206)623-7292 • FACSIMILE (206)623-0594



78.    This is a claim for treble damages and for forfeitures under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

79.    Through the acts described above and otherwise, defendants entered into a conspiracy or conspiracies among themselves and their member physicians to defraud the United States and Washington Medicaid program by getting false and fraudulent claims allowed or paid.  Defendants have also conspired among themselves and their member physicians to omit disclosing or to actively conceal facts which, if known, would have reduced government obligations to them or resulted in repayments from them to government programs.  Defendants have taken substantial steps in furtherance of those conspiracies, *inter alia*, by preparing false audit reports and other records, by submitting claims for reimbursement to the Government for payment or approval, and by directing their agents, consultants, and personnel not to disclose and/or to conceal defendants' fraudulent practices.

80.    The United States, its agents, the Washington Medicaid program, and CHAMPUS program unaware of defendants' conspiracy or the falsity of the records, statements and claims made by defendants and their agents, and employees, and as a result thereof, have paid and continue to pay millions of dollars that they would not otherwise have paid.  Furthermore, because of the false records, statements, claims, and omissions by defendants and their agents, and employees, the United States, its agents, the Washington Medicaid program, and CHAMPUS program have not recovered federal funds from the defendants that otherwise would have been recovered.

81.    By reason of defendants conspiracies and the acts taken in furtherance thereof, the United States and the Washington Medicaid program have been damaged in the amount of millions of dollars in federal funds.

**WHEREFORE,** plaintiff/relator prays for judgment against defendants as follows:

82.    That defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                                    - 24 -

1344.10 0001 BSC.DOC





83.     That the Court enter judgment against defendants in an amount equal to three times the amount of damages the United States has sustained as a result of defendants' actions, as well as a civil penalty against each defendant of $10,000 for each violation of 31 U.S.C. § 3729;

84.     That plaintiff/relator be awarded the maximum amount allowed pursuant to § 3730(d) of the Federal Civil False Claims Act;

85.     That plaintiff/relator be awarded all costs and expenses of this action, including attorneys' fees; and

86.     That the United States and plaintiff/relator receive all such other relief as the Court deems just and proper.

## JURY DEMAND

87.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby demands trial by jury.

DATED this 3rd day of August, 1999.

HAGENS BERMAN, P.S.


By _____
    Steve W. Berman, WSBA No. 12536
    Jeffrey T. Sprung, WSBA No. 23607
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    (206) 623-7292

Mr. Stephen L. Meagher
PHILLIPS & COHEN
131 Steuart St., Suite 501
San Francisco, CA 94105
(415) 836-9000

Attorneys for Plaintiff/Relator Mark F. Erickson

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                          - 25 -

1344.10 0001 BSC.DOC

